# General Civil Case Filing Information Form (Non-Domestic)

**Court**
☑ Superior
☐ State

**County** COBB

**Docket #** 10-1-11419-49

**Date Filed** 11/23/2010
MM-DD-YYYY

**Plaintiff(s)**

Dees    Mark
Last   First   Middle I. Suffix Prefix        Maiden

Dees    Claire
Last   First   Middle I. Suffix Prefix        Maiden

_____
Last   First   Middle I. Suffix Prefix        Maiden

_____
Last   First   Middle I. Suffix Prefix        Maiden

**No. of Plaintiffs** 2

**Plaintiff/Petitioner's Attorney**   ☑ Pro Se

_____
Last        First        Middle I.   Suffix

**Bar #** _____

**Defendant(s)**

Washington Mutual Bank, F.A.
Last   First   Middle I. Suffix Prefix        Maiden

Chase Home Finance LLC
Last   First   Middle I. Suffix Prefix        Maiden

J.P. Morgan Chase, N.A.
Last   First   Middle I. Suffix Prefix        Maiden

John Does 1-1000
Last   First   Middle I. Suffix Prefix        Maiden

**No. of Defendants** 4

---

## Check Primary Type (Check only ONE)

☐ Contract/Account

☐ Wills/Estate

☑ Real Property

☐ Dispossessory/Distress

☐ Personal Property

☐ Equity

☐ Habeas Corpus

☐ Appeals, Reviews

☐ Post Judgment Garnishment, Attachment, or Other Relief

☐ Non-Domestic Contempt

☐ Tort (If tort, fill in right column)

☐ Other General Civil Specify _____

_____

## If Tort is Case Type:
### (Check no more than TWO)

☐ Auto Accident

☐ Premises Liability

☐ Medical Malpractice

☐ Other Professional Negligence

☐ Product Liability

☐ Other Specify _____

**Are Punitive Damages Pleaded?** ☐ Yes ☑ No

Filed In Office Nov-23-2010 15:30:39
ID# 2010-0195423-CV
Page 1
Jay C. Stephenson
Clerk of Superior Court Cobb County

**DISCLOSURE STATEMENT**
**CLERK OF SUPERIOR COURT**

Filed In Office Nov-23-2010 15:38:39
ID# 2010-0195422-CV
Page 1 CH

*Jay C. Stephenson*

Jay C. Stephenson
Clerk of Superior Court Cobb County

CASE NUMBER 10-1-11419-49
           Assigned by Clerk

Mark and Claire Dees
           PLAINTIFF

           VS.

Washington Mutual Bank, F.A.
           DEFENDANT
Chase Home Finance, LLC
J.P. Morgan Chase, N.A.
John Does 1 ~~1000 my~~            TYPE OF ACTION

1. ____ Divorce without Agreement Attached
2. ____ Divorce with Agreement Attached
3. ____ Domestic Relations
4. ____ Damages arising out of Contract
5. ____ Damages arising out of Tort
6. ____ Condemnation
7. ____ Equity
8. ____ Zoning – County Ordinance violations (i.e. Injunctive relief- zoning)
9. ____ Zoning Appeals (denovo)
10.____ Appeal, Including denovo appeal-excluding Zoning

11. ____ URESA
12. ____ Name Change
13. _✓_ Other Quiet + title Action
14. ____ Recusal
15. Petition to Verify Debt

____ Adoption

**PREVIOUS RELATED CASES**

Does this case involve substantially the same parties, or substantially the same subject matter, or substantially the same factual issues, as any other case filed in this court?  (Whether pending simultaneously or not.)

_✓_ NO

____ YES – If yes please fill out the following:
           1. Case #_____
           2. Parties _____vs. _____
           3. Assigned Judge _____
           4. Is this case still pending? ____Yes  _✓_ No
           5. Brief description of similarities:

_____

_____

Mark Dees 11-23-2010
      Pro Se
Claire Dees 11/23/2010
**Attorney or Party Filing Suit**
      Pro Se

Form #0122
Revised 12/01/09

Filed In Office Nov-23-2010 15:30:39
ID# 2010-0195421-CV
Page 1

*Jay C. Stephenson* EH

Jay C. Stephenson
Clerk of Superior Court Cobb County

## SUPERIOR COURT OF COBB COUNTY
### STATE OF GEORGIA

MARK DEES
CLAIRE DEES

PETITIONERS:                    CIVIL ACTION FILE NO. 10-1-11419-49

RESPONDENTS :
WASHINGTON MUTUAL BANK, F.A.
CHASE HOME FINANCE, .LLC.
J.P. MORGAN CHASE, N.A.
JOHN DOES 1-~~1000~~

and all persons unknown, claiming any legal or equitable right , title , estate, lien, or interest in

the property described in the complaint named as JOHN DOES  1 ~~through 1000.~~

## PETITION TO QUIET TITLE

COMES NOW,  MARK DEES AND CLAIRE DEES ,  Petitioners "hereinafter petitioners or

plaintiffs" in the above styled case  and files this his Complaint against Respondents hereinafter

referred to as "respondents or defendants"and in support thereof would show unto the Court the

following matters and facts:

Petitioners  are  adult residents and  citizen of  Gwinnett County, Georgia. The subject property

is situated in Cobb County, Georgia and is subject to jurisdiction of this court.

Respondents , hereinafter WASHINGTON MUTUAL BANK, F A  , is or was a bankrupt national

company whose principal address  is 1301 Second Avenue, Seattle Washington , 98101-3033 .

Respondent , CHASE HOME FINANCE LLC. A subsidiary of  J.P. Morgan Chase, N.A. Whose

principal address is  1111 Polaris Parkway Columbus OH 43240-2301.

Respondent J.P. Morgan Chase, N.A. , is a national public corporation , whose principal address

is 1111 Polaris Parkway Columbus OH 43240-2301 and whose registered agent is C T

Corporations Systems, Inc. 1201 Peachtree St NE Atlanta, Ga 30361.

Respondents John Does 1-1000. Plaintiff has no knowledge of the true names and identities of all

of the  mbs investors , bond certificate holders, or possible real parties in interest  since they

were intentionally  hidden from the plaintiff after repeated written requests. Plaintiff therefore

sues them by such fictitious names. This Complaint will be amended when the true identities are

ascertained .

The property which is the subject matter of this action situated in the County of Cobb,

State of Georgia , and described as follows:

ALL THAT TRACT  or parcel of land lying and being in Land Lot 105, 17th District 2nd Section of
Cobb County, Georgia, being Lot 42, Maple Valley Estates Subdivision, Unit III, Section 1,
according to plat recorded in Plat Book 100, Page 6, Cobb County Records, Reference to said
plat is hereby made for a complete description of the property herein described. Said property is
improved known as 517 Pineland Circle, according to the present system of numbering property
in Cobb County, Georgia.

Respondents designated as DOES 1-1000 "all persons unknown claiming any legal or equitable

right, title, estate, lien or interest in the property described in the Complaint."

Petitioners , are now, and at all times mentioned in this Complaint, was an owner of and in the

possession of all the real property described in Paragraph 5 above, said real property to be

hereinafter referred to as the 517 Pineland Circle, SW Mableton , GA 30126 . The security deed

is dated December 5th 2003 and is recorded in deed book 13907, Page 3540 Cobb County Records.

Respondents , and each of them in this action, claim an interest and estate in the Property

adverse to petitioners . Respondents  claims are based on the following: Petitioners by way of

affidavit of notary presentment mailed a good faith request, qualified written request, debt

validation notice  and other notices on exhibit "D" 1-8 attached, by certified mail to respondents

on August 17th 2010 . The notices "D" 1-8 attached were signed for and acknowledged by

Respondents and accepted by "K B". The original ink signed note or a place to visually inspect it

was requested . Chase responded on letter dated October 4th, 2010, by sending only a copy of the

note, security deed, etc. but no original and did not offer or provide a place to visually inspect

the original ink signed note as requested.  Under title 24-4-23, 24-3-36 of the Georgia Code this

constitutes an admission they do not have the original note in their  possession and are not the

creditor having no rights whatsoever in regards to the property.  It is  respondents belief that

securitization nullifies the note see explanation by expert witness and securities lawyer attached

on exhibit "S" ,"How Securitization Nullifies the Note"and the note is paid in full by tarp, credit

default swaps, insurance proceeds to the only party who invested  funds namely the bond

certificate holders or investors in the mutual fund.  The note has also been illegally decoupled

from the note rendering it void and Chase admits they are not the holder and yet desires to

foreclose my property without having to prove ownership of the note. This means that anyone,

true creditor or not true creditor,  could begin filing foreclosures on anyone else's  home

without having to prove ownership. Also multiple claimants could come forward if the real note

turned up and claim the money is due to them and the borrower might  owe the money all over

again to the holder of the original note , a negotiable instrument.  Excess distribution of funds

may be due the borrower from payouts, tarp, credit default swaps and  insurance proceeds

vastly exceeding the amount of the loan balance and yet no credit has been given to borrowers

loan balance  and Chase has refused to provide their double entry book keeping

ledgers for the borrower to inspect.   Borrow does not trust the word of the respondents. See

article entitled "Fla Ct Finds JP Morgan Intentionally and Knowingly Committed Fraud on The

Court "exhibit F attached.  Is Chase above the law ?  Chase is one of the lenders named in the

robo signing controversy being investigated by attorney Generals in fifty states.

Petitoner has exclusive, complete, actual, open, and continuous possession of

the Property adverse to defendants for more than seven years.  Petitioner has paid all taxes

levied or assessed against the property and all other assessments during the past seven years.

Plaintiff has made and paid for all repairs, upkeep, and insurance on the property for the

past seven  years.  Unless the defendants are enjoined from asserting their adverse claims to the

property, defendants will continue to assert their adverse claims resulting in irreparable harm, damage, and injury to plaintiff. Plaintiff has no other adequate remedy at law.

Wherefore , plaintiff respectfully requests judgment against defendants and each of them known or unknown as follows:

That Defendants be required to set forth the right, nature, and virtue of their claim to the property , and that all adverse claims of the defendants be determined by decree of this court.

That it be declared and adjudged that plaintiff is the owner of the property and entitled to possession;

That it be declared and adjudged that the defendants have no estate , right, title, or interest whatsoever in or to the property or any part of it.

That Defendants (or respondents)  be permanently enjoined and restrained from asserting any estate , right,title, security deed, or interest whatsoever, in or to the property or any part of it adverse to plaintiff;  For costs;and For such other and further relief as the court may deem proper. See exhibits D, 1-8 attached , S, F, ⌐.

Respectfully submitted ,

*Mark Dees*

*Mark Hoyt Dees*    11/23/10

Petitioner/Plaintiff  Pro Se , Mark Dees

*Claire Dees*    11/23/10

Petitioner /Plaintiff  Pro Se,  Claire Dees

Exhibit L

**ALL THAT TRACT or parcel of land lying and being in Land Lot 105, 17th District 2nd Section of Cobb County, Georgia, being Lot 42, Maple Valley Estates Subdivision, Unit III, Section 1, according to plat recorded in Plat Book 100, Page 6, Cobb County Records, Reference to said plat is hereby made for a complete description of the property herein described. Said property is improved known as 517 Pineland Circle, according to the present system of numbering property in Cobb County, Georgia.**

# VERIFICATION

We, Plaintiffs, Mark Dees and Claire Dees , having been duly sworn , under penalty of perjury,

deposes and says that I am over the age of eighteen (18) and mentally competant to testify in this

matter, and from first hand knowledge state: My person and my property are in danger of

immediate and irreparable injury , an loss, or damage will result to the applicant before the

adverse party or his attorney can be heard in opposition ; and I hereby certify , that the facts set

forth regarding all matters stated in the above paragraphs are true and correct to the best of my

knowledge and belief, therefore since this is an Emergency Petition further notice should not be

required . I have read the foregoing pleading , the facts stated therein are from first hand

knowledge and are true and correct to the best of my knowledge and belief.

_Hoyt_
_Mark Dees_   11/23/2010

MARK DEES, PRO SE

_Claire Dees_   _C. Dees_

CLAIRE DEES, PRO SE    11/23/10

Notarizing Signature only ~ Rm

Subscribed and sworn to before me,

this 23rd , day of November, 2010.

Seal

_Retta McRae_

Notary Public

My Commission Expires: _____

Notarizing Signature only ~Rm

Georgia, Cobb County

Signed before me this 23 day of November 20 10

By Mark Hoyt Dees

Type and # of ID GA _____ 859188

E 07 - 0 ____

Notary Signature

Retta McRae

Notary Name Typed or ____

My Commission Expires
March 18, 2011

## SUPERIOR COURT OF COBB COUNTY
### STATE OF GEORGIA

### CIVIL ACTION FILE NO:

PLAINTIFF
MARK DEES
CLAIRE DEES

DEFENDANTS

J P MORGAN CHASE, N.A.
CHASE HOME FINANCE LLC.
WASHINGTON MUTUAL BANK, F.A.


CERTIFICATE OF SERVICE

I  Mark Dees, Claire Dees, Certify that I have this 23rd day of November, 2010 served the foregoing
Verified Emergency Petition for Temporary Restraining Order and or preliminary Injunction upon
Defendants through  their registered agent or principal office of business by causing a  true and correct
copy to be served by commercial process server as follows:


Registered Agent of J P Morgan Chase N. A.
CT Corporations Systems Inc.

1201 Peachtree ST NE

Atlanta, GA 30361


This  23rd day of November, 2010

How securitization nullifies the original note and mortgage. The...Page 3 of 11

*EXHIBIT "S"*

- ■ Attorney Network Expands to Over 150 Lawyers in 37 States
    - ■ The Evolving Mortgage Audit and Analysis Process
  - ■ LAWYER-CLIENT JOB FAIR BY TELECONFERENCE — ***SPREAD THE WORD***
  - ■ Find a Lawyer that "Gets It"

## Tags

audit bailout Bank of America bankruptcy borrower borrowers Chapter 13 countrywide credit credit crisis creditor disclosure discovery Eviction Federal reserve Florida foreclosure foreclosure defense foreclosure offense fraud HERS inflation investors lawyers lender Lender Liability lenders lost note MERS Mortgage mortgage meltdown NACA Ny Times Obama predatory lending principal reduction quiet title rescission RESPA RICO securitization TILA TILA audit trustee Wells Fargo

[_____] [Search]

## How securitization nullifies the original note and mortgage. The Originating Lender is PAID IN FULL

Posted on March 30, 2009 by Neil Garfield

By the METHOD of pooling and tranching, they converted from negotiable to non-negotiable instrument. (Article VIII UCC).

That means that upon transfer the recipient of the payment is satisfied in full and a new obligation arises between the seller and buyer separate and apart from the borrower. Further, the method calls for the proceeds of payment from one note to be used as collateral (cross collateralization) for another. This breaches the terms of the note which states that payments by borrower will be applied to what the borrower owes.

So the investor receives the "benefit" of multiple obligors plus insurance and credit default swaps and an investment grade rating that was obtained under false pretenses. But what the investor is holding is not the original note. He/she/it is holding a stream of revenue with multiple conditions. A conditional promise to pay is not a negotiable instrument.

The only party on record as mortgagee or beneficiary under a deed of trust has been paid in full as to principal, paid in full as to disclosed fees, and has received undisclosed fees as well because they were standing in for the real lender whose identity and existence was withheld from the borrower — all TILA violations.

The purpose of the disclosure requirements is to crate enough transparency that both the funding source and the borrower can readily perceive the risks of the transaction. In this case the pattern of conduct was to make sure the investor and borrower could never get together to compare notes. This prevented the borrower from assessing whether better terms were available (instead of huge fees going to intermediaries) and it prevented the investor from assessing the risk and rate of return on investment (because only a portion of the invested dollars was going to fund mortgages — the rest going to fees spread around like a whiskey bottle at a frat party (Mike Stuckey's phrase, MCNBC.com).

**Spread the word**    StumbleUpon    Digg    Reddit    [ Share ]

ID# 2010-0195421-CV   Page 8

Exhibit "F"

- ■ Attorney Network Expands to Over 150 Lawyers in 37 States
  - ■ The Evolving Mortgage Audit and Analysis Process
- ■ LAWYER-CLIENT JOB FAIR BY TELECONFERENCE — ***SPREAD THE WORD***
- ■ Find a Lawyer that "Gets It"

- **Tags**

audit bailout Bank of America bankruptcy borrower borrowers Chapter 13 countrywide credit credit crisis creditor disclosure discovery Eviction Federal reserve Florida foreclosure foreclosure defense foreclosure offense fraud HERS inflation investors lawyers lender Lender Liability lenders lost note MERS Mortgage mortgage meltdown note ny Times Obama predatory lending principal reduction quiet title rescission RESPA RICO securitization TILA TILA audit trustee Wells Fargo

- [..................] [Search]

# Fla Ct Finds JP Morgan Intentionally and Knowingly Committed Fraud on The Court

Posted on September 27, 2010 by Neil Garfield

## SERVICES YOU NEED

**"As basis for the legal case, WaMu had submitted an assignment of mortgage, which however the court just found never actually belonged to WaMu, and instead was carried on the books of Fannie Mae."**

**EDITOR'S NOTE: It's an old story to us but it's news to everyone else. Yes it IS fraud, and all you have to do is look, inquire and aggressively press the opposition.**

**Just like Wells Fargo in Massachusetts, GMAC now in 23 states so far, the story is always the same — the lawyer doesn't know who he/she represents and doesn't care, the documents submitted are fabricated and forged and the representation that the would-be forecloser is a creditor is a plan and simple lie — only revealed AFTER they are pressed to support their claim of standing, real party in interest, holder of the note etc.**

*ALL the foreclosures and notices of sale, motions to lift stay, motions for summary judgment start the same way. Some party picked at random from the securitization chain comes in and starts a foreclosure sale (non-judicial) or a foreclosure lawsuit after documents are fabricated showing a chain of title that never happened and doesn't exist.*

*MOST of the time borrowers and the Courts are intimidated by the presence of a "Bank" (which is neither acting as a bank nor was it the lender, creditor, or payee at any point in the process of the closing of the transaction between the homeowner as borrower and the investor as lender).*

*SOME of the time, borrowers are successful in their challenges to the foreclosure. The reason is not that the rest of the foreclosures are proper, right, legal or equitable. The reason is that in those cases where the borrower is successful they managed to get the Judge to pause long enough to actually look at the*

ID# 2010-0195421-CV Page 9

Fla Ct Finds JP Morgan Intentionally and Knowingly Committe... Page 4 of 26

*documents being presented and to allow the borrower to inquire as to their authenticity and authority. If there is such an inquiry the borrower wins. If there is no such inquiry, the borrower loses.*

*ALL of the proceedings in which foreclosures were initiated in both non-judicial and judicial states are fatally defective and has resulted in a pile of debris called "title" when in fact no title has been transferred, no credit bid was ever submitted and no deed was issued with authority from a party who possessed the right to convey title.*

Each day an angry judge realizes he/she has been duped for years by these antics of people he knew and trusted. Criminal acts, contemptuous of the law and the Courts have been committed in millions of foreclosures.

None of the agencies that are charged with responsibility to regulate the activities of these banks, institutions or companies has lifted a finger to impose existing rules and regulations that were designed to prevent this behavior and punish it when it occurs. None of the Courts want to apply clear Federal law on the subject in the Truth in Lending Act and the Real Estate Settlement and Procedures Act. Because when it comes right down to it, the facts unfolding in the lead news stories and in the court orders being entered are downright unthinkable.

We have now come to that fork in the road where we must stop anyone who asks "why would they lie?" and simply admit that it has ALL been a BIG LIE and we have been living this lie for 10 years, hence the name of this blog.

So there is no mistake about it I am stating the opinion that NONE of the foreclosure sales on residential property in which the loan was originated as part of a securitization scheme are valid. They are void. If you think you lost your home you're wrong no matter what anyone tells you. Any lawyer who studies this instead of responding from a knee-jerk "I remember that issue from law school" will come to the same conclusion — the title chain is not just clouded, it is fatally defective. That means the foreclosures were void according to existing law. It is the same effect as if I signed a warranty deed conveying title to YOUR home now. Such a document might LOOK good, but it is fraudulent, because I don't have the title to convey much less warrant that it is good title. But if Judge won't let you speak or won't even consider the possibility that I would flat out lie and file a totally fraudulent deed, I'll win and you'll lose. That's what is happening.

### JPMorgan Brings Foreclosure Case In Mortgage In Which It Was Just A Servicer, Court Finds Bank Committed Fraud



Submitted by Tyler Durden on 09/16/2010 16:37 -0500

- Fannie Mae
- Florida
- WaMu

An interesting development out of Jean Johnson, Circuit Judge in Duval Country, Florida, where in a case filed by JPMorgan/WaMu, as Plaintiff, and law firm of Shapiro and Fishman, attempted to evict defendants Hank and Marilyn Pocopanni. **As basis for the legal case, WaMu had submitted an assignment of mortgage, which however the court just found never actually belonged to WaMu, and instead was carried on the books of Fannie Mae.**

ID# 2010-0195421-CV Page 18

ID# 2010-0195421-CV
Page 11



## ADJUSTABLE RATE NOTE
(12-MTA Index - Payment and Rate Caps)

03-2352-064800121-2

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ __138,000.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

__December 5, 2003__          __ATLANTA__          __Georgia__
                                                 (City)                    (State)

__517 PINELAND CIRCLE 6M, MABLETON, GA 30126__
                              (Property Address)

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __110,400.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __Washington Mutual Bank, FA__. I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. Up until the first day of the calendar month that immediately precedes the first payment due date set forth in Section 3 of this Note, I will pay interest at a yearly rate of __4.602__ %. Thereafter until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of __1.650__ %. The interest rate required by this Section 2 and Section 4 of this Note is the Rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

(A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, "payments" refer to Principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I will make my monthly payments on __1st__ day of each month beginning on __February, 2004__, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __January 1, 2034__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __369.01__, unless adjusted at an earlier time under Section 4(H) of this Note.

03-2352-064800121-2

**(C) Payment Changes**

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may further change on the ___1st___ day of ___February, 2004___, and on that day every month thereafter. Each such day is called a "Change Date".

**(B) The Index**

On each Change Date, my interest rate will be based on an index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding ___Three & Three-Tenths___ percentage points ___3.300___ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

**(D) Interest Rate Limit**

My interest rate will never be greater than ___Nine & Five-Tenths___ percentage points ___9.500___ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

**(E) Payment Change Dates**

Effective every year commencing ___February 1, 2005___, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

03-2352-054600121-2

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on   the maturity date in substantially equal payments.  For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will ad the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate.  For each month that the  monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to __125%__ of the principal amount original borrowed.  In the event my unpaid Principal would otherwise exceed that __125%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(i) Required Full Monthly Payment**

On the __FIFTH__ anniversary of the due date of the first monthly payment, and on that same day every __FIFTH__ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment".  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the principal amount of the Note.  If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.  My partial prepayment may have the effect of reducing the amount of my monthly payments, but only after the first Payment Change Date following my partial Prepayment.  However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (a) any such loan charge shall be reduced by the amount

03-2352-064800121-2

necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $ 15.00 . Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of Fifteen calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

03-2352-064800121-2

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver

ID# 2010-0195421-CV
Page 16

03-2352-064800121-2

to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

x _Mark Dees_
MARK DEES

x _Claire Dees_
CLAIRE DEES



## Prepayment Fee Note Addendum

03-2352-064800121-2

This Note Addendum is made this __8th__ day of __December, 2003_____ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of _____Washington Mutual Bank, FA_____ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal before they are due.  Any payment of principal, before it is due, is known as a "prepayment."   A prepayment of only part of the unpaid principal is known as a "partial prepayment."  A prepayment of the full amount of the unpaid principal is known as a "full prepayment."

If I make a full prepayment, I may be charged a fee as follows:

   If Noteholder receives a prepayment on or before the first anniversary of the date of the Note, the Prepayment Fee shall be equal to __Three__ percent ( __3.000__ %) of the original loan amount.  If Noteholder receives prepayment after the first anniversary but on or before the __second__ anniversary of the date of the Note, the prepayment fee shall be __Two____ percent ( __2.000__ %) of the original loan amount.  If Noteholder receives prepayment after the second anniversary but on or before the __Third____ anniversary of the date of the Note, the prepayment fee shall be __One__ percent ( __1.000__ %) of the original loan amount.  Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note.  Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at any time without penalty accrued but unpaid interest that has been added to principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so.  Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full.  Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

ID# 2010-0195421-CV
Page 18

03-2352-064800121-2

**NOTICE TO THE BORROWER**
   Do not sign this Note Addendum before you read it.  This Note Addendum provides for the payment of a Prepayment Fee if you wish to repay the loan prior to the date provided for repayment in the Note.

   By signing below, Borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

x   _Mark Dees_____
MARK DEES

x   _Claire Dees_____
CLAIRE DEES

Deed Book 13907 Pg 3540
Filed and Recorded Dec-30-2003 11:07am
2003-0316658
Georgia Intangible Tax Paid $414.00

Jay C. Stephenson
Clerk of Superior Court Cobb Cty. Ga.

AFTER RECORDING RETURN TO:
Washington Mutual Bank, FA
C/O ACS LENDER SOLUTIONS
12691 PALA DRIVE MS156DPCA
GARDEN GROVE, CA 92841

GERALD W. FUDGE
ATTORNEY AT LAW
100 GLENRIDGE POINT PKWY
SUITE 150
ATLANTA, GEORGIA 30342

21/62

————————— [Space Above This Line For Recording Data] —————————

Gerald W Fudge, Atty at Law

## SECURITY DEED

APPROXIMATE MAXIMUM LOAN BALANCE: 138,000.00
(for intangible tax calculation only)               03-2152-064600121-2

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined
in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this
document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated _____December 5, 2003_____,
together with all Riders to this document.
(B) "Borrower" is ___MARK DEES AND CLAIRE DEES_____

_____

_____

Borrower is the grantor under this Security Instrument.
(C) "Lender" is _____Washington Mutual Bank, FA, a federal association_____
Lender is a _____Bank_____ organized and existing under the laws of
___United States of America_____ Lender's address is:
_____400 West Main Street Stockton, CA 95290_____
Lender is the grantee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated ___December 5, 2003___.
The Note states that Borrower owes Lender _One Hundred Ten Thousand Four Hundred &
00/100_____

Dollars (U.S. $ ___110,400.00_____ ) plus interest. Borrower has promised to pay this debt
in regular Periodic Payments and to pay the debt in full not later than ___January 1, 2034___.
(E) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.

GEORGIA
73215 (02-01)                    Page 1 of 17

ID# 2010-0195421-CV
Page 20

Deed Book 13907 Pg 3541

03-2352-064800122-2

(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

[x] Adjustable Rate Rider    [ ] Condominium Rider          [x] 1-4 Family Rider
[ ] Graduated Payment Rider  [ ] Planned Unit Development Rider  [ ] Biweekly Payment Rider
[ ] Balloon Rider            [ ] Rate Improvement Rider     [ ] Second Home Rider
[ ] Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds, whether by way of judgment, settlement or otherwise, paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note; and (iii) the performance of all agreements of Borrower to pay fees and charges arising out of the loan whether or not herein set forth. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power

GEORGIA
73113 (05-01)                          Page 2 of 17

ID# 2010-0195421-CV
Page 21

Deed Book 13907 Pg 3542

03-2352-064800121-2

of sale, the following described property located in ___Cobb_____ County,
Georgia :

SEE EXHIBIT "A"

which currently has the address of __512 PINELAND CIRCLE SW_____
                                                    [Street]

_____MABLETON_____, Georgia      30126     ("Property Address"):
          [City]                             [Zip Code]

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all
easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements
and additions shall also be covered by this Security Instrument. All of the foregoing is referred to
in this Security Instrument as the "Property."

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed
and has the right to grant and convey the Property and that the Property is unencumbered, except
for encumbrances of record. Borrower warrants and will defend generally the title to the Property
against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and
non-uniform covenants with limited variations by jurisdiction to constitute a uniform security
instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.
Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and
any prepayment charges and late charges due under the Note. Borrower shall also pay funds for
Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument
shall be made in U.S. currency. However, if any check or other instrument received by Lender as
payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may
require that any or all subsequent payments due under the Note and this Security Instrument be
made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c)
certified check, bank check, treasurer's check or cashier's check, provided any such check is
drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or
entity; or (d) Electronic Funds Transfer.
    Payments are deemed received by Lender when received at the location designated in the
Note or at such other location as may be designated by Lender in accordance with the notice
provisions in Section 15. Lender may return any payment or partial payment if the payment or
partial payments are insufficient to bring the Loan current. Lender may accept any payment or
partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or
prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not
obligated to apply such payments at the time such payments are accepted. If each Periodic

Georgia
73215 01-01                        Page 3 of 17

Deed Book 13907 Pg 3543

03-2352-064000121-2

Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance of the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke

GEORGIA
73214 (02-01)                                    Page 4 of 17

Deed Book 13907 Pg 3544

03-2352-064900121-2

the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than twelve monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than twelve monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

GEORGIA
73514 (02-01)

Page 5 of 17

Deed Book 13907 Pg 3545

03-2382-054600121-2

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Lender may purchase such insurance from or through any company acceptable to Lender including, without limitation, an affiliate of Lender, and Borrower acknowledges and agrees that Lender's affiliate may receive consideration for such purchase. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to all proceeds from any insurance policy (whether or not the insurance policy was required by Lender) that are due, paid or payable with respect to any damage to such property, regardless of whether the insurance policy is established before, on or after the date of this Security Instrument. By absolutely and irrevocably assigning to Lender all of Borrower's rights to receive any and all proceeds from any insurance policy, Borrower hereby waives, to the full extent allowed by law, all of Borrower's rights to receive any and all of such insurance proceeds.

Borrower hereby absolutely and irrevocably assigns to Lender all of Borrower's right, title and interest in and to (a) any and all claims, present and future, known or unknown, absolute or contingent, (b) any and all causes of action, (c) any and all judgments and settlements (whether through litigation, mediation, arbitration or otherwise), (d) any and all funds sought against or from any party or parties whosoever, and (e) any and all funds received or receivable in

Deed Book 13907 Pg 3546

03-2352-064600121-2

Including but not limited to, land subsidence, landslide, windstorm, earthquake, fire, flood or any other cause.

Borrower agrees to execute, acknowledge if requested, and deliver to Lender, and/or upon notice from Lender shall request any insurance agency or company that has issued any insurance policy to execute and deliver to Lender, any additional instruments or documents requested by Lender from time to time to evidence Borrower's absolute and irrevocable assignments set forth in this paragraph.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, or remove or demolish any building thereon, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in good condition and repair in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property in good and workmanlike manner if damaged to avoid further

Deed Book 13907 Pg 3547

03-2352-064600121-2

deterioration or damage. Lender shall, unless otherwise agreed in writing between Lender and Borrower, have the right to hold insurance or condemnation proceeds. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause. Lender does not make any warranty or representation regarding, and assumes no responsibility for, the work done on the Property, and Borrower shall not have any right to rely in any way on any inspection(s) by or for Lender or its agent. Borrower shall be solely responsible for determining that the work is done in a good, thorough, efficient and workmanlike manner in accordance with all applicable laws.

Borrower shall (a) appear in and defend any action or proceeding purporting to affect the security hereof, the Property or the rights or powers of Lender or Trustee; (b) at Lender's option, assign to Lender, to the extent of Lender's interest, any claims, demands, or causes of action of any kind, and any award, court judgement, or proceeds of settlement of any such claim, demand or cause of action of any kind which Borrower now has or may hereafter acquire arising out of or relating to any interest in the acquisition or ownership of the Property. Lender and Trustee shall not have any duty to prosecute any such claim, demand or cause of action. Without limiting the foregoing, any such claim, demand or cause of action arising out of or relating to any interest in the acquisition or ownership of the Property may include (i) any such injury or damage to the Property including without limit injury or damage to any structure or improvement situated thereon, (ii) or any claim or cause of action in favor of Borrower which arises out of the transaction financed in whole or in part by the making of the loan secured hereby, (iii) any claim or cause of action in favor of Borrower (except for bodily injury) which arises as a result of any negligent or improper construction, installation or repair of the Property including without limit, any surface or subsurface thereof, or of any building or structure thereon or (iv) any proceeds of insurance, whether or not required by Lender, payable as a result of any damage to or otherwise relating to the Property or any interest therein. Lender may apply, use or release such monies so received by it in the same manner as provided in Paragraph 5 for the proceeds of insurance.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting

Page 8 of 17

Deed Book 13907 Pg 3548

C3-2352-064800121-2

and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage

GEORGIA
73316 8240U                    Page 9 of 17

Deed Book 13907 Pg 3549

02-2352-064800121-2

insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is

Deed Book 13907 Pg 3550

03-2252-064900191-2

less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgement, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgement, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. This Security Instrument cannot be changed or modified except as otherwise provided herein or by agreement in writing signed by Borrower, or any Successor in Interest to Borrower and Lender. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successor in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy. No waiver by Lender of any right under this Security Instrument shall be effective unless in writing. Waiver by Lender of any right granted to Lender under this Security Instrument or of any provision of this Security Instrument as to any transaction or occurrence shall not be deemed a waiver as to any future transaction or occurrence.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by

GEORGIA
73314 (02-01)                    Page 11 of 17

Deed Book 13907 Pg 3551

03-2352-064800121-2

Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Borrower shall pay such other charges as Lender may deem reasonable for services rendered by Lender and furnished at the request of Borrower, any Successor in Interest to Borrower or any agent of Borrower. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the

GEORGIA
73316 (06/11)                Page 12 of 17

Deed Book 13907 Pg 3552

03-2352-064800121-2

conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument,

Deed Book 13907 Pg 3553

03-2352-064800121-2

and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substance in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use, or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Page 14 of 17

Deed Book 13907 Pg 3554

03-2352-064800121-2

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22.  Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale, Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. If Borrower or any successor in interest to Borrower files (or has filed against Borrower or any successor in interest to Borrower) a bankruptcy petition under Title II or any successor title of the United States Code which provides for the curing of prepetition default due on the Note, interest at a rate determined by the Court Shall be paid to Lender on post-petition arrears.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines, Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyances. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorney's fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23.  Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is not prohibited by Applicable Law.

24.  Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

69242A
71214 (02-01)                    Page 16 of 17

Deed Book 13907 Pg 3555

03-2352-064600121-2

27. Assumption Not a Novation.  Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

28.  Security Deed.  This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

BORROWER ACCEPTS AND AGREE to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.  IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

WITNESS

x _____
                                        WITNESS

x _____
                                        WITNESS

x _____
MARK DEES

x _____
CLAIRE DEES

SIGN04
73314(02-01)                    Page 15 of 17

Deed Book 13907 Pg 3556

03-2352-066000221-2

———————————— (Space Below This Line For Acknowledgment) ————————————

Notary Public, _Fulton_ County

My Commission Expires: 4/4/05

(Notary Seal)

Deed Book 13907 Pg 3557

## EXHIBIT "A"

All that tract or parcel of land lying and being in Land Lot 105, 17th District, 2nd Section, of Cobb County, Georgia, being Lot 42, Maple Valley Estates Subdivision, Unit III, Section 1, according to plat recorded in Plat Book 100, Page 6, Cobb County Records. Reference to said plat is hereby made for a complete description of the property herein described.  Said property is improved property known as 517 Pineland Circle, according to the present system of numbering property in Cobb County, Georgia.

SA\REFORM\5\03-10378

Deed Book 13907 Pg 3558

**1-4 FAMILY RIDER**
**Assignment of Rents**

03-2352-064800121-2

THIS 1-4 FAMILY RIDER is made this ___8th___ day of ___December, 2003___, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to _____ Washington Mutual Bank, FA _____ (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

_____ 817 PINELAND CIRCLE SW, MABLETON, GA 30126 _____
[Property Address]

1-4 FAMILY COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY INSTRUMENT. In addition to the Property described in the Security Instrument, the following items now and hereafter attached to the Property to the extent they are fixtures added to the Property description, and shall also constitute the Property covered by the Security Instrument: building materials, appliances and goods of every nature whatsoever now or hereafter located in, on, or used, or intended to be used in connection with the Property, including, but not limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus, security and access control apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, panelling and attached floor coverings, all of which, including replacements and additions thereto, shall be deemed to be and remain a part of the Property covered by the Security Instrument. All of the foregoing together with the Property described in the Security Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and the Security Instrument as the "Property."

B. USE OF PROPERTY; COMPLIANCE WITH LAW. Borrower shall not seek, agree to or make a change in the use of the Property or its zoning classifications, unless Lender has agreed in writing to the change. Borrower shall comply with all laws, ordinances, regulations and requirements of any governmental body applicable to the Property.

C. SUBORDINATE LIENS. Except as permitted by federal law, Borrower shall not allow any lien inferior to the Security Instrument to be perfected against the Property without Lender's prior written permission.

986 (02-01)                          Page 1 of 3

ID# 2010-0195421-CV
Page 38

Deed Book 13907 Pg 3559

03-2352-064800121-2

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required by Section 5.

**E. "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise agree in writing, the Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.** Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property. Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this Paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H. ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.** Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable. Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent. This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property, (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance premiums, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

848 (07-01)                    Page 2 of 3

Deed Book 13907 Pg 3560

03-2352-066800121-2

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower. However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs. Any application of Rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I. CROSS-DEFAULT PROVISION.**

Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this 1-4 Family Rider.

x _Mark Dees_____
   MARK DEES

x _Claire Dees_____
   CLAIRE DEES

969 (01-01)                    Page 3 of 3

ID# 2010-0195421-CV
Page 40

Deed Book 13907 Pg 3561

## ADJUSTABLE RATE RIDER
(12-MTA Index - Payment and Rate Caps)

03-2352-064800121-2

THIS ADJUSTABLE RATE RIDER is made this ___5th___ day of ___December, 2002___,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
___Washington Mutual Bank, FA___ (the "Lender") of the same date and
covering the property described in the Security instrument and located at:

___517 PINELAND CIRCLE NW, MABLETON, GA 30126___
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN ___125%___ OF THE ORIGINAL AMOUNT (OR $___138,000.00___),
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND
RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
instrument, Borrower and Lender further covenant and agree as follows:

A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.
Up until the first day of the calendar month that immediately precedes the first payment due date
set forth in Section 3 of the Note, I will pay interest at a yearly rate of ___4.602___%. Thereafter
until the first Change Date (as defined in Section 4 of the Note) I will pay interest at a yearly rate
of ___1.550___%. The interest rate I will pay will thereafter change in accordance with Section 4
of the Note.
Section 4 of the Note provides for changes in the interest rate and monthly payment as
follows:

32843 (11-01)                Page 1 of 6

Deed Book 13907 Pg 3562

03-2352-054500121-2

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The interest rate I will pay may change on the _____ 1st _____ day of _____ February, 2004 _____ , and on that day every month thereafter. Each such day is called a "Change Date".

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____ Three & Three-Tenths _____ percentage points 3.300 % ("Margin") to Current Index. The Note Holder will then round the result of this addition to the nearest one thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). The difference will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit

My interest rate will never be greater than 9.500 % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates

Effective every year commencing _____ February 1, 2005 _____ , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the

32543 (01-01)                                                              Page 2 of 5

Deed Book 13907 Pg 3563

03-2352-064800121-2

amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

(F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

(G) Changes In My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a Principal reduction of the Note.

(H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid Principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

(I) Required Full Monthly Payment

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my

Deed Book 13907 Pg 3564

03-2352-064800121-2

monthly payment before the effective date of any change.  The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

(K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement , the intent of which is the transfer of title by Borrower at a future date to a purchaser.  If all or any part of the Property or any Interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the

32843 (11-01)                Page 4 of 5

Deed Book 13907 Pg 3565

03-2352-054900121-7

transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

x _Mark Derr_____
MARK DERR

x _Claire Derr_____
CLAIRE DERR

33143(11-01)                    Page 6 of 6

*Exhibit "D" (contains items 1-8)*
*(1-8)   List of Documents*

## AFFIDAVIT OF NOTARY PRESENTMENT

On August 17th, 2010, Mark Dees and Claire Dees, appeared before me with the following documents listed below. I, the below signed notary, personally verified that these documents were placed in an envelope and sealed by me. They were sent by the United States Post Office by ~~Registered Mail Return~~ *Certified   11/0/83* receipt requested. The receipt number was: *7009 0820 0000 0339 7245* and the mailing was addressed to CHASE HOME FINANCE, J. P. Morgan Chase, N.A. And also Washington Mutual Bank and was mailed personally by me to the address of 6716 Grade Lane Building 9 Suite 910, Louisville, Kentucky 40213.

List of documents (1-8) below:

1. TENDER OF PAYMENT IN FULL WITHIN TEN DAYS UPON PRODUCTION OF REQUESTED DOCUMENTS. (3 PAGES).
2. EXHIBIT "A" LOAN NUMBERS AND ADDRESSES (1 PAGE)
3. AFFIDAVIT OF NOTARY PRESENTMENT (1 PAGE)
4. QUALIFIED WRITTEN REQUEST (20 PAGES)
5. GOOD FAITH LETTER REQUESTING INFORMATION ( 5 PAGES)
6. NOTICE OF OBJECTION TO MODIFICATIONS (1 PAGE)
7. NOTICE OF REQUEST FOR DEBT VALIDATION ( 1 PAGE)
8. NOTICE OF OBJECTION TO FORECLOSURE SALE ( 1 PAGE)


*Ana Cristina Oliver*
Notary Print Name

*Ana Cristina Oliver*
Notary Signature

Notary Seal




*certified*

Registered Mail Return Receipt Requested : 7009 0820 0000 0339 7745
August 17th , 2010

TO: Servicing Agent for Lender ,and to the real party in interest .
 Loan Number: 0662960343. and all  loan numbers listed on exhibit A attached
and also to attorney for servicing agent.

To: Payoff Department
Washington Mutual Bank/ aka WAMU
and  J. P. Morgan Chase, N.A.
6716 Grade Lane
Building 9 Suite 910
Louisville, Kentucky 40213

Please forward to any and all entities claiming to be the real party  in interest.

## TEN DAY NOTICE OF OFFER TO TENDER PAYOFF IN FULL UPON PRODUCTION OF DOCUMENTS SHOWING UNBROKEN CHAIN OF AUTHORITY TO RECEIVE , AND COLLECT FUNDS

This letter constitutes an offer of conditional acceptance . Although I object to and dispute the amount
of the payoff demand statement since the client you represent has already defaulted on a prior qualified
written request to provide the original ink signed note and other documents outlined below which
would have shown their authority to collect the payoff.  However, even though my prior request for the
original ink promissory note has been ignored I am willing to try one more time in good faith to request
your authority to represent the real lender , and the unbroken chain of  authority to receive my payoff in
full which I am hereby tendering in this letter.

Demand is hereby made again for the following documents prior to paying off this loan in full.

1.  The **Original Ink Promissory Note** . Who is the real lender ? Since the original note is a
    negotiable instrument and therefore may be exchanged  for cash.  And since there are many
    parties involved in this undisclosed securitization chain there is a probability that there could be
    other claimants to this negotiable instrument. Since anyone could potentially have the original
    note, only the holder in due course has the right to the payoff.  If it was endorsed in blank please
    indicate so in writing. If it was destroyed intentionally please explain in writing. If this note or
    the pool it was co mingled with has been paid by TARP or  insurance proceeds, default swaps,
    or settlement funds please indicate so in writing within ten days. Send the original ink signed
    promissory note front and back or a place that is convenient to me in the metro Atlanta area  to
    inspect it front and back with my attorney present in its original form.
2.  **The original ink signed security deed** recorded at the courthouse.
3.  The **Securities Prospectus** that was provided  to the Securities and Exchange Commission
    involving the  pool or pools of mortgage backed securities my loan was placed in.
4.  A copy of the **State Securities Registration number** relating to the mortgage backed
    securities pool or pools  that my loan may have been associated with. Please answer Yes it is
    registered or No it is not registered.

5. A complete and unbroken securitization chain along with appropriate recorded, assignments and written directives from all assignees, a place to view the originals with my attorney present. The names and identities addresses and contact information of the all parties in interest and intermediaries , nominees, nominal lenders , trustees, and trust documents, master servicing agreement, pooling and servicing agreement. I want to make sure there was no break in the authorization chain back to the original party who advanced the funds namely the bond certificate holders. Send all of their contact information, full names and phone numbers  so that I may compare notes with them.

6. The assignment and assumption agreement involving the pool or pools that this loan was placed in.

7. The pooling and servicing agreement.

8. Any and all insurance policies in the securities chain and the names of the beneficiaries and parties of each one and who the claims  were made payable to .

9. Electronic Registration System. Which mortgage electronic registration system was a participant in my loan and what was the exact nature of their responsibilities? Provide the lenders agreement with the electronic registration system in an unbroken chain back to the bond investors and address of service and contact information of all parties in the mortgage backed securities chain that this loan was associated with.

10. A copy of all trusts and trust documents relating to my loan and the accounting ledgers and current tax and securities registration filings .

11. All monetary transactions and ledgers relating to my loan and to the two pools which my loan was placed in so that I may verify with my CPA  the correct balance after applying all payments made by myself or third party TARP funds, and default insurance proceeds , to the original investor who claims to have advanced the funds.

Demand is hereby made for the documents listed above within ten days (10) prior to paying this loan in full. No payoff in full and no further payments will be made until the items above are provided and  the items attached on good faith notice are either admitted or denied on a point by point basis using a sworn notarized affidavit and oath  will full liability from the chief executive officer , or the chief financial officer of the alleged lender, and any other party claiming to be the real party in interest ,along with complete contact information including but not limited to the officers email, phone, and  business address. In the event you do not respond on a point by point basis to items above this will constitute an admission that your client does not have the legal right or authority to collect this payoff , collect the monthly payments, or the legal standing to  foreclose on the property.  In this event of default , you and your client will be agreeing that I may at my option  file and record  with the county recorders office a revocation of the power of attorney contained in the security deed , and that I may consider the deed to secure debt unenforceable and void and that I may at my option file a civil complaint and a lis pendens, ,rescind the loan, revoke the power of attorney contained in the deed to secure debt due to breach of fiduciary responsibility, and reissue a deed back to myself conveying the property to me or any party that I designate free and clear of your clients security deed. Upon your failure to provide your authority to collect my payoff within ten days will constitute an admission that your security instrument is invalid , void, and unenforceable and you will be agreeing to release the security deed on the public record within 30 days.  You will also be admitting that your client will owe a refund to me of all of the payments paid to date along with my attorneys fees and costs of collection, fines, penalties for violations of  RESPA , TILA , Reg Z , treble damages for predatory lending and any and all violations of state and federal laws. You will also be admitting and agreeing that I may at my option file an additional quiet title action to clear the existing deed to secure debt on the security deed and all attorneys fees for this will be paid by your company. Special stipulations which shall control: Instead of sending items 1-10 above to prove your company has the legal authority to receive payoff funds simply

provide items number 1& 2 , the originals (signed in ink and not a certified copy) of the promissory note and security deed, above within ten days and I will tender a payoff in full. These actions will be void in any location where these actions are prohibited by law.

Please forward these parties to the real creditor,  the various Trustees, the Loan Servicer and MERS and any other parties in interest who may have a claim to this payoff.

Signature _____

Signature _____

Notary Public _____

Witness _____



Exhibit   "A"

**Mark Dees and Claire Dees**

**Loan Numbers      Street Address**

---

| Loan Numbers | Street Address |
|---|---|
| .064 800 1220. | 91 hebron church rd |
| .064 800 1212. | 517 pineland avenue |
| .0662960459. | 3096 springlake drive |
| .0662960426. | 1009 Windsor drive |
| .0662960558. | 3226 sunderland drive |
| .0662960400. | 505 radio court |
| .0662960343. | 1785 cherry log way |
| .0662960434. | 5126 rockborough trail |
| .0662960509. | 405 shadetree lane |
| .0664801253. | 2613 milo court |
| .0662960582. | 4256 nora lane |
| .0662960616. | 610 clearwater place |
| .0648001287. | 2741 treehouse lane |
| .0662960467. | 47 hayden court |
| .066 296 0491. | 3531 quail hollow trail |
| .0083437400. | 4315 friar tuck lane Buford |
| .0083437392. | 4661 broadwater trail |
| .0083437301. | 712 shoals circle |
| .0083437442. | 6464 East Windsor lane |

August 17th, 2010

## QUALIFIED WRITTEN REQUEST, COMPLAINT, DISPUTE OF DEBT AND VALIDATION OF DEBT LETTER, TILA REQUEST

**This letter is a "qualified written request" in compliance with and under the Real Estate Settlement Procedures Act, 12 U.S.C. Section 2605(e).**

Reference: Account # .0662960343, and all other loan numbers listed on exhibit A attached hereto and incorporated herein by reference. (hereinafter the subject loan(s) and is/are the reference for all questions and requests described below).

Definitions of First Party or Borrower or "(Your Name)" will mean: Mark Dees, and if applicable also Claire Dees . By the usage of the word borrower or borrower's I am not admitting or agreeing that a valid debt still or ever did exist.

Definitions of Second Party or Lender or "(Lenders Name)" will mean in regards to these loan numbers, the alleged lender, pretender lenders, all intermediary lenders, nominal lenders, J.P. Morgan Chase Bank, N.A. , Washington Mutal Bank, also known as WAMU, Mortgage Electronic Registration Systems aka MERS, Trustees, Fiduciaries, any servicing agent , any and all intermediary serving in any capacity with or without authority for the real party in interest. By using the term "Lender" I am not agreeing or acknowledging that any of these parties are the real party in interest or that a valid debt even still exists.

Dear Sir or Madam:

I am writing to you to complain about the accounting and servicing of this mortgage and my need for understanding and clarification of various sale, transfer, funding source, legal and beneficial ownership, charges, credits, debits, transactions, reversals, actions, payments, analyses and records related to the servicing of this account from its origination to the present date.

To date, the documents and information I have, that you have sent me, and the conversations with your service representatives have been unproductive and have not answered my questions.

Needless to say, I am very concerned. With all the news lately regarding the stories of predatory lending, you have left me feeling that there is something you are trying to hide. I worry that potential fraudulent and deceptive practices by unscrupulous mortgage brokers; sales and transfers of mortgage servicing rights; deceptive and fraudulent servicing practices to enhance balance sheets; deceptive, abusive and fraudulent accounting tricks and practices may have also negatively affected any credit rating, mortgage account and/or the debt or payments that I am currently, or may be legally obligated to.

To independently validate this debt, I need to conduct a complete exam, audit, review and accounting of this mortgage account from its inception through the present date. Upon receipt of this letter, please refrain from reporting any negative credit information (if any) to any credit-reporting agency until you respond to each of the requests.

I also request that you conduct your own investigation and audit of this account since its inception to validate the debt you currently claim I owe. I would like you to validate the debt so that it is accurate to the penny!

Please do not rely on previous servicing companies or originators records, assurances or indemnity agreements and refuse to conduct a full audit and investigation of this account.

I understand that potential abuses by you or previous servicing companies could have deceptively, wrongfully, unlawfully, and/or illegally:
Increased the amounts of monthly payments;
Increased the principal balance I owe;
Increased the escrow payments;
Increased the amounts applied and attributed toward interest on this account;
Decreased the proper amounts applied and attributed toward the principal on this account; and/or
Assessed, charged and/or collected fees, expenses and miscellaneous charges I am not legally obligated to pay under this mortgage, note and/or deed of trust.

I request you insure that I have not been the victim of such predatory servicing and lending practices.

To insure this, I have authorized a thorough review, examination, accounting and audit of mortgage account # See exhibit A attached by mortgage auditing and predatory servicing or lending experts. This exam and audit will review this mortgage account file from the date of initial contact, application and the origination of this account to the present date written above.

Again, this is a Qualified Written Request under the Real Estate Settlement Procedures Act, codified as Title 12 section 2605(e) of the United States Code as well as a request under the Truth In Lending Act 15 U.S.C. section 1601. RESPA provides substantial penalties and fines for non-compliance or failure to answer my questions provided in this letter within sixty (60) days of its receipt.

In order to conduct the examination and audit of this loan, I need to have full and immediate disclosure including copies of all pertinent information regarding this loan. The documents requested and answers to my questions are needed by myself and others to ensure that this loan:

1-Was originated in lawful compliance with all federal and state laws, regulations including, but not limited to Title 62 of the Revised Statutes, RESPA, TILA, Fair Debt Collection Practices Act, HOEPA and other laws;

2-That the origination and/or any sale or transfer of this account or monetary instrument, was conducted in accordance with proper laws and was a lawful sale with complete disclosure to all parties with an interest;

3-That you disclose the claimed holder in due course of the monetary instrument/deed of trust/asset is holding such note in compliance with statutes, State and Federal laws and is entitled to the benefits of payments;

4-That all good faith and reasonable disclosures of transfers, sales, Power of Attorney, monetary instrument ownership, entitlements, full disclosure of actual funding source, terms, costs, commissions, rebates, kickbacks, fees etc. were and still are properly disclosed to me, including but not limited to the period commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

5-That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in accordance with statute, laws and the terms of mortgage, monetary instrument/deed of trust, including but not limited to all accounting or bookkeeping entries commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof;

6-That each servicers and/or sub-servicers of this mortgage has serviced this mortgage in compliance with local, state and federal statutes, laws and regulations commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof, ;

7-That this mortgage account has been credited, debited, adjusted, amortized and charged correctly and disclosed fully commencing with the original loan solicitation through and including any parties, instruments, assignments, letters of transmittal, certificates of asset backed securities and any subsequent transfer thereof ;

8-That interest and principal have been properly calculated and applied to this loan;

9-That any principal balance has been properly calculated, amortized and accounted for;

10-That no charges, fees or expenses, not obligated by me in any agreement, have been charged, assessed or collected from this account or any other related account arising out of the subject loan transaction.

In order to validate this debt and audit this account, I need copies of pertinent documents to be provided to me. I also need answers, certified, in writing, to various servicing questions. For each record kept on computer or in any other electronic file or format, please provide a paper copy of all information in each field or record in each computer system, program or database used by you that contains any information on this account or my name.

As such, please send to me, at the address above, copies of the documents requested below as soon as possible. Please also provide copies, front and back, of the following documents regarding account # see exhibit A attached hereto.

1-Any certificated or uncertificated security used for the funding of this account;

2-Any and all "Pool Agreement(s)" or "servicing agreements" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any government sponsored entity, hereinafter GSE or other party;

3-Any and all "Deposit Agreement(s)" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

4-Any and all "Servicing Agreement(s)" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

5-Any and all "Custodial Agreement(s)" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

6-Any and all "Master Purchasing Agreement(s)" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

7-Any and all "Issuer Agreement(s)" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

8-Any and all "Commitment to Guarantee" agreement(s) between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

9-Any and all "Release of Document" agreement(s) between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

10-Any and all "Master Agreement for Servicer's Principal and Interest Custodial Account" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

11-Any and all "Servicer's Escrow Custodial Account" between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

12-Any and all "Release of Interest" agreement(s) between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and any GSE or other party;

13-Any Trustee agreement(s) between the nominal lender at the loan closing and any party or parties who could claim an interest in the loan closing or documents pertaining thereto and trustee(s) regarding this account or pool accounts with any GSE or other party;

Please also send me copies, front and back, of:

1-Any documentation evidencing any trust relationship regarding the Mortgage/Deed of Trust **and** any Note in this matter;

2-Any and all document(s) establishing any Trustee of record for the Mortgage/Deed of Trust **and** any Note;

3-Any and all document(s) establishing the date of any appointment of Trustee Mortgage/Deed of Trust **and** any Note, including any and all assignments or transfers or nominees of any substitute trustees(s);

4-Any and all document(s) establishing any Grantor for this Mortgage/Deed of Trust **and** any Note;

5-Any and all document(s) establishing any Grantee for this Mortgage/Deed of Trust **and** any Note;

6-Any and all document(s) establishing any Beneficiary for this Mortgage/Deed of Trust **and** any Note;

7-Any documentation evidencing the Mortgage/Deed of Trust is **not** a constructive trust or any other form of trust;

8-All data, information, notations, text, figures and information contained in your mortgage servicing and accounting computer systems including, but not limited to Alltel or Fidelity CPI system, or any other similar mortgage servicing software used by you,

any servicers, or sub-servicers of this mortgage account from the inception of this account to the date written above.

9-All descriptions and legends of all Codes used in your mortgage servicing and accounting system so the examiners and auditors and experts retained to audit and review this mortgage account may properly conduct their work.

10-All assignments, transfers, allonge, or other documents evidencing a transfer, sale or assignment of this mortgage, deed of trust, monetary instrument or other document that secures payment by me to this obligation in this account from the inception of this account to the present date including any such assignment on MERS.

11-All records, electronic or otherwise, of assignments of this mortgage, monetary instrument or servicing rights to this mortgage including any such assignments on MERS.

12-All deeds in lieu, modifications to this mortgage, monetary instrument or deed of trust from the inception of this account to the present date.

13-The front and back of each and every canceled check, money order, draft, debit or credit notice issued to any servicers of this account for payment of any monthly payment, other payment, escrow charge, fee or expense on this account.

14-All escrow analyses conducted on this account from the inception of this account until the date of this letter.

15-The front and back of each and every canceled check, draft or debit notice issued for payment of closing costs, fees and expenses listed on any and all disclosure statements including, but not limited to, appraisal fees, inspection fees, title searches, title insurance fees, credit life insurance premiums, hazard insurance premiums, commissions, attorney fees, points, etc.

16-Front and back copies of all payment receipts, checks, money orders, drafts, automatic debits and written evidence of payments made by others or me on this account.

17-All letters, statements and documents sent to me by your company.

18-All letters, statements and documents sent to me by agents, attorneys or representatives of your company.

19-All letters, statements and documents sent to me by previous servicers, sub-servicers or others in your account file or in your control or possession or in the control or possession of any affiliate, parent company, agent, sub-servicers, servicers, attorney or other representative of your company.

20-All letters, statements and documents contained in this account file or imaged by you, any servicers or sub-servicers of this mortgage from the inception of this account to the present date.

21-All electronic transfers, assignments and sales of the note/asset, mortgage, deed of trust or other security instrument.

22-All copies of property inspection reports, appraisals, BPOs and reports done on my property.

23-All invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this mortgage account from the inception of this account to the present date.

24-All checks used to pay invoices for each charge such as inspection fees, BPOs, appraisal fees, attorney fees, insurance, taxes, assessments or any expense which has been charged to this account from the inception of this account to the present date.

25-All agreements, contracts and understandings with vendors that have been paid for any charge on this account from the inception of this account to the present date.

26-All account servicing records, payment payoffs, payoff calculations, ARM audits, interest rate adjustments, payment records, transaction histories, account histories, accounting records, ledgers, and documents that relate to the accounting of this account from the inception of this account to the present date.

27-All account servicing transaction records, ledgers, registers and similar items detailing how this account has been serviced from the inception of this account to the present date.

Further, in order to conduct the audit and review of this account, and to determine all proper amounts due, I need the following answers to questions concerning the servicing and accounting of this mortgage account from its inception to the present date. Accordingly, please provide me, in writing, the answers to the following questions:

In regards to Account Accounting and Servicing Systems:

1-Please identify for me each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date so that experts can decipher the data provided.

2-For each account accounting and servicing system identified by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide the name and address of the company that designed and sold the system.

3-For each account accounting and servicing system used by you and any sub-servicers or previous servicers from the inception of this account to the present date, please provide

the complete transaction code list for each system so that I, and others can adequately audit this account.

**In regards to Debits and Credits:**

1-In a spreadsheet form or in letter form in a columnar format, please detail for me each and every credit on this account from the date such credit was posted to this account as well as the date any credit was received.

2- In a spreadsheet form or in letter form in a columnar format, please detail for me each and every debit on this account from the date such debit was posted to this account as well as the date any debit was received.

3-For each debit and credit listed, please provide me with the definition for each corresponding transaction code you utilize.

4-For each transaction code, please provide the master transaction code list used by you or previous servicers.

In regards to Mortgage and Assignments:

1-Has each sale, transfer or assignment of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in the county property records in the county and state in which my property is located from the inception of this account to the present date? Yes or No?

2-If not, why?

3-Is your company the servicer of this mortgage account or the holder in due course and beneficial owner of this mortgage, monetary instrument and/or deed of trust?

4-Have any sales, transfers or assignments of this mortgage, monetary instrument, deed of trust or any other instrument I executed to secure this debt been recorded in any electronic fashion such as MERS or other internal or external recording system from the inception of this account to the present date? Yes or No?

5-If yes, please detail for me the names of the seller, purchaser, assignor, assignee or any holder in due course to any right or obligation of any note, mortgage, deed of trust or security instrument I executed securing the obligation on this account that was not recorded in the county records where my property is located whether they be mortgage servicing rights or the beneficial interest in the principal and interest payments.

**In regards to Attorney Fees:**

For purposes of the questions below dealing with attorney fees, please consider attorney fees and legal fees to be one in the same.

1-Have attorney fees ever been assessed to this account from the inception of this account to the present date? Yes or No?

2-If yes, please detail each separate assessment, charge and collection of attorney fees to this account from the inception of this account to the present date and the date of such assessments to this account.

3-Have attorney fees ever been charged to this account from the inception of this account to the present date? Yes or No?

4- If yes, please detail each separate charge of attorney fees to this account from the inception of this account to the present date and the date of such assessments to this account.

5-Have attorney fees ever been collected from this account from the inception of this account to the present date? Yes or No?

6-If yes, please detail each separate collection of attorney fees to this account from the inception of this account to the present date and the date of such assessments to this account.

7-Please provide me with the name and address of each attorney or law firm that has been paid any fees or expenses related to this account from the inception of this account to the present date.

8-Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment, charge or collection of attorney fees.

9-Please detail and list for me in writing each separate attorney fee assessed from this account and for which each corresponding payment period or month such fee was assessed from the inception of this account to the present date.

10- Please detail and list for me in writing each separate attorney fee collected from this account and for which each corresponding payment period or month such fee was collected from the inception of this account to the present date.

11-Please detail and list for me in writing any adjustments in attorney fees assessed and on what date such adjustment was made and the reason for such adjustment.

12- Please detail and list for me in writing any adjustments in attorney fees collected and on what date such adjustment was made and the reason for such adjustment.

13-Has interest been charged on any attorney fees assessed or charged to this account? Yes or No?

14-Is interest allowed to be assessed or charged on attorney fees charged or assessed to this account? Yes or No?

15-How much total in attorney fees have been assessed to this account from the inception to the present date?

16-How much total in attorney fees have been collected from this account from the inception to the present date?

17-How much total in attorney fees have been charged to this account from the inception to the present date?

18-Please send me copies of all invoices and detailed billing statements from any law firm or attorney that has billed such fees that have been assessed or collected from this account from the inception to the present date.

**In regards to Suspense/Unapplied Accounts:**

For purposes of this section, please treat the term suspense account and unapplied account as one in the same.

1-Has there been any suspense or unapplied account transactions on this account from the inception of this account until the present date? Yes or No?

2-If yes, please explain the reason for each and every suspense transaction that occurred on this account. If no, please skip the questions in this section dealing with suspense and unapplied accounts.

3-In a spreadsheet or in letter form in a columnar format, please detail for me each and every suspense or unapplied transaction, both debits and credits that has occurred on this account from the inception of this account to the present date.

**In regards to late fees:**

For purposes of my questions below dealing with late fees, please consider the terms late fees and late charges to be one in the same.

1-Have you reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

2-Has any previous servicers or sub-servicers of this mortgage reported the collection of late fees on this account as interest in any statement to me or to the IRS? Yes or No?

3-Do you consider the payment of late fees as liquidated damages to you for not receiving payment on time? Yes or No?

4-Are late fees considered interest? Yes or No?

5-Please detail for me in writing what expenses and damages you incurred for any payment I made that was late.

6-Were any of these expenses or damages charged or assessed to this account in any other way? Yes or No?

7-If yes, please describe what expenses or damages were charged or assessed to this account.

8-Please describe for me in writing what expenses you or others undertook due to any payment I made, which was late.

9- Please describe for me in writing what damages you or others undertook due to any payment I made, which was late.

10-Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment or collection of late fees.

11-Please detail and list for me in writing each separate late fee assessed to this account and for which corresponding payment period or month such late fee was assessed from the inception of this account to the present date.

12-Please detail and list for me in writing each separate late fee collected from this account and for which corresponding payment period or month such late fee was collected from the inception of this account to the present date.

13-Please detail and list for me in writing any adjustments in late fees assessed and on what date such adjustment was made and the reason for such adjustment.

14-Has interest been charged on any late fee assessed or charged to this account? Yes or No?

15-Is interest allowed to be assessed or charged on late fees to this account? Yes or No?

16-Have any late charges been assessed to this account? Yes or No?

17-If yes, how much in total late charges have been assessed to this account from the inception of this account to the present date?

18-Please provide me with the exact months or payment dates you or other previous servicers or sub-servicers of this account claim I have been late with a payment from the inception of this account to the present date.

19-Have late charges been collected on this account from the inception of this account to the present date? Yes or No?

20-If yes, how much in total late charges have been collected on this account from the inception of this account to the present date?

**In regards to Property Inspections:**

For the purpose of this section property inspection and inspection fee refer to any inspection of property by any source and any related fee or expense charged, assessed or collected for such inspection.

1-Have any property inspections been conducted on my property from the inception of this account to the present date? Yes or No?

2-If your answer is no, you can skip the rest of the questions in this section concerning property inspections.

3-If yes, please tell me the date of each property inspection conducted on my property that is the secured interest for this mortgage, deed of trust or note.

4-Please tell me the price charged for each property inspection.

5-Please tell me the date of each property inspection.

6-Please tell me the name and address of each company and person who conducted each property inspection on my property.

7-Please tell me why property inspections were conducted on my property.

8-Please tell me how property inspections are beneficial to me.

9-Please tell me how property inspections are protective of my property.

10-Please explain to me your policy on property inspections.

11-Do you consider the payment of inspection fees as a cost of collection? Yes or No?

12-If yes, why?

13-Do you use property inspections to collect debts? Yes or No?

14-Have you used any portion of the property inspection process on my property to collect a debt or inform me of a debt, payment or obligation I owe? Yes or No?

15-If yes, please answer when and why?

16-Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment or collection of property inspection fees.

17-Have you labeled in any record or document sent to me a property inspection as a miscellaneous advance? Yes or No?

18-If yes, why?

19-Have you labeled in any record or document sent to me a property inspection as a legal fee or attorney fee? Yes or No?

20-If yes, why?

21-Please detail and list for me in writing each separate inspection fee assessed to this account and for which corresponding payment period or month such fee was assessed from the inception of this account to the present date.

22- Please detail and list for me in writing each separate inspection fee collected from this account and for which corresponding payment period or month such fee was collected from the inception of this account to the present date.

23-Please detail and list for me in writing any adjustments in inspection fees assessed and on what date such adjustment was made and the reasons for such adjustment?

24- Please detail and list for me in writing any adjustments in inspection fees collected and on what date such adjustment was made and the reasons for such adjustment?

25-Has interest been charged on any inspection fees assessed or charged to this account? Yes or No?

26-If yes, when and how much was charged?

27-Is interest allowed to be charged on inspection fees charged or assessed to this account? Yes or No?

28-How much total in inspection fees has been assessed to this account from the inception of this account to the present date?

29-How much total in inspection fees has been collected on this account from the inception of this account to the present date?

30-Please forward to me copies of all property inspections made on my property in this mortgage account file.

31-Has any fee charged or assessed for property inspections been placed into an escrow account? Yes or No?

**In regards to BPO Fees:**

1-Have any BPOs (Broker Price Opinions) been conducted on my property? Yes or No?

2- If your answer is no, you can skip the rest of the questions in this section concerning BPOs.

3-If yes, please tell me the date of each BPO conducted on my property that is the secured interest for this mortgage, deed of trust or note.

4-Please tell me the price of each BPO.

5-Please tell me who conducted the BPO.

6-Please tell me why BPOs were conducted on my property.

7-Please tell me how BPOs are beneficial to me.

8-Please tell me how BPOs are protective of my property.

9-Please explain your policy on BPOs.

10-Have any BPO fees been assessed to this account? Yes or No?

11-If yes, how much in total BPO fees have been charged to this account?

12-Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment, charge or collection of a BPO fee from me.

13-Please send to me copies of all BPO reports that have been done on my property.

14-Has any fee charged or assessed for a BPO been placed into an escrow account? Yes or No?

**In regards to Force-Placed Insurance:**

1-Have you placed or ordered any force-placed insurance policies on my property?

2-If yes, please tell me the date of each policy ordered or placed on my property that is the secured interest for this mortgage, deed of trust or note.

3-Please tell me the price of each policy.

4-Please tell me the agent for each policy.

5-Please tell me why each policy was placed on my property.

6-Please tell me how the policies are beneficial to me.

7-Please tell me how the policies are protective of my property.

8-Please explain to me your policy on force-placed insurance.

9-Have any force-placed insurance fees been assessed to this account? Yes or No?

10-If yes, how much in total force-placed insurance fees have been assessed to this account?

11-Have any force-placed insurance fees been charged to this account? Yes or No?

12-If yes, how much in total force-placed insurance fees have been charged to this account?

13-Please identify for me in writing the provision, paragraph, section or sentence of any note, mortgage, deed of trust or any agreement I signed that authorized the assessment, charge or collection of force-placed insurance fees from me.

14-Do you have any relationship with the agent or agency that placed any policies on my property? If yes, please describe.

15-Do you have any relationship with the carrier that issued any policies on my property? If yes, please describe.

16-Has the agency or carrier you used to place a forced-placed insurance on my property provided you any service, computer system, discount on policies, commissions, rebates or any form of consideration? If yes, please describe.

17-Do you maintain a blanket insurance policy to protect your properties when customer policies have expired? Yes or No?

18-Please send to me copies of all forced-placed insurance policies that have been ordered on my property from the inception of this account to the present date.

**In regards to Servicing:**

For each of the following questions listed below, please provide me with a detailed explanation in writing that answers each question. In addition, I need the following answers to questions concerning the servicing of this account from its inception to the present date.

1-Did the originator or previous servicers of this account have any financing agreements or contracts with your company or an affiliate of your company?

2-Did the originator or previous servicers of this account have any financing agreements or contracts with your company or an affiliate of your company?

3-Did the originator or previous servicers of this account receive any compensation, fee, commission, payment, rebate or other financial consideration from your company or affiliate of your company for handling, processing, originating or administering this loan? If yes, please describe and itemize each and every form of compensation, fee, commission, payment, rebate or other financial consideration paid to the originator of this account by your company or any affiliate.

4-Please identify for me where the originals of this entire account file are currently located and how they are being stored, kept and protected.

5-Where is the original monetary instrument or mortgage I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

6-Where is the original deed of trust or mortgage and note I signed located? Please describe its physical location and anyone holding this note as a custodian or trustee if applicable.

7-Since the inception of this account, has there been any assignment of my monetary instrument/asset to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignments.

8-Since the inception of this account, has there been any assignment of the deed of trust or mortgage and note to any other party? If the answer is yes, identify the names and

addresses of each and every individual, party, bank, trust or entity that has received such assignments.

9- Since the inception of this account, has there been any sale or assignment of the servicing rights to this mortgage account to any other party? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has received such assignments or sale.

10-Since the inception of this account, have any sub-servicers serviced any portion of this mortgage account? If the answer is yes, identify the names and addresses of each and every individual, party, bank, trust or entity that has sub-serviced this mortgage account.

11-Has this mortgage account been made a part of any mortgage pool since the inception of this loan? If yes, please identify for me each and every account mortgage pool that this mortgage has been a part of from the inception of this account to the present date.

12-Has each and every assignment of my asset/monetary instrument been recorded in the county land records where the property associated with this mortgage account is located?

13-Has there been any electronic assignment of this mortgage with MERS (Mortgage Electronic Registration System) or any other computer mortgage registry service or computer program? If yes, identify the name and address of each and every individual, entity, party, bank, trust or organization or servicers that have been assigned to mortgage servicing rights to this account as well as the beneficial interest to the payments of principal and interest on this loan.

14-Have there been any investors (as defined by your industry) who have participated in any mortgage-backed security, collateral mortgage obligation or other mortgage security instrument that this mortgage account has ever been a part of from the inception of this account to the present date? If yes, identify the name and address of each and every individual, entity, organization and/or trust.

15-Please identify for me the parties and their addresses to all sales contracts, servicing agreements, assignments, alonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from the inception of this account to the present date.

16-Please provide me with copies of all sales contracts, servicing agreements, assignments, alonges, transfers, indemnification agreements, recourse agreements and any agreement related to this account from the inception of this account to the present date.

17-How much was paid for this individual mortgage account by you?

18-If part of a mortgage pool, what was the principal balance used by you to determine payment for this individual mortgage loan?

any agreement related to this account from the inception of this account to the present date.

17-How much was paid for this individual mortgage account by you?

18-If part of a mortgage pool, what was the principal balance used by you to determine payment for this individual mortgage loan?

19-If part of a mortgage pool, what was the percentage paid by you of the principal balance above used to determine purchase of this individual mortgage loan?

20-Who did you issue a check or payment to for this mortgage loan?

21-Please provide me with copies of the front and back of the canceled check.

22-Did any investor approve of the foreclosure of my property? Yes or No?

23-Has HUD assigned or transferred foreclosure rights to you as required by 12 USC 3754?

24-Please identify all persons who approved the foreclosure of my property.


Please provide me with the documents I have requested and a detailed answer to each of my questions within the lawful time frame. Upon receipt of the documents and answers, an exam and audit will be conducted that may lead to a further document request and answers to questions under an additional RESPA Qualified Written Request letter.

Copies of this Qualified Written Request, Validation of Debt, TILA and request for accounting and legal records, Dispute of Debt letter are being sent to FTC, HUD, Thrift Supervision, and all relevant state and federal regulators; and other consumer advocates; and my congressman.

It is my hope that you answer this RESPA request in accordance with law and the questions, documents and validation of debt to the penny and correct abuses or schemes uncovered and documented.


### Default Provisions under this QUALIFIED WRITTEN REQUEST

Second Party  or any agents, transfers, or assigns omissions of or agreement by silence of this RESPA REQUEST via certified rebuttal of any and all points herein this RESPA REQUEST, agrees and consents to including but not limited by any violations of law and/or immediate terminate/remove any and all right, title and interest (liens) in First Party  or any property or collateral connected to First Party  or account #see A  and waives any and all immunities or defenses in claims and or violations agreed to in this RESPA REQUEST including but not limited by any and all:

1-First Party's right, by breach of fiduciary responsibility and fraud and misrepresentation revocation and rescinding any and all power of attorney or appointment Second Party may have or may have had in connection with account # see exhibit "A" and any property and/or real estate connected with account # see A attached .

2-Borrower's right to have any certificated or uncertificated security re-registered in Borrower's, and only Borrower's name.

3-Borrower's right of collection via Lender's liability insurance and/or bond.

4- First Party's entitlement in filing and executing any instruments, as power of attorney for and by Lender , including but not limited by a new certificated security or any security agreement perfected by filing a UCC Financing Statement with the Secretary of State in the State where Lender is located.

5-First Party's right to damages because of Second Party's wrongful registration, breach of intermediary responsibility with regard to First Party asset by Second Party issuing to First Party, a certified check for the original value of First Party's monetary instrument.

6-First Party's right to have account # exhibit A completely set off because Second Party's wrongful registration, breach of intermediary responsibility with regard to First Party's monetary instrument/asset by Second Party's sending confirmation of set off of wrongful liability of First Party and issuing a certified check for the difference between the original value of First Party's monetary instrument/asset and what First Party mistakenly sent to Second Party as a payment for such wrongful liability.

Lender or any transfers, agents or assigns offering a rebuttal of this RESPA REQUEST must do so in the manner of this RESPA REQUEST in accordance of and in compliance with current statutes and/or laws by signing in the capacity of a fully liable man or woman being responsible and liable under the penalty of perjury while offering direct testimony with the official capacity as appointed agent for Second Party in accordance with Second Party Articles of Incorporation, By Laws duly signed by a current and duly sworn under oath director(s) of such corporation/ Holding Corporation/ National Association. Any direct rebuttal with certified true and complete accompanying proof must be posted with the Notary address herein within sixty days. When no verified rebuttal of this RESPA REQUEST is made in a timely manner, a "Certificate of Non-Response" serves as Second Party judgment and consent/agreement by means of silence with any and all claims and/or violations herein stated in the default provisions or any other law.

Power of Attorney: When Second Party fails by not rebutting to any part of this RESPA REQUEST , Second Party agrees with the granting unto First Party's unlimited Power of

Attorney and any and all full authorization in signing and endorsing Second Party's name upon any instruments in satisfaction of the obligations of this RESPA.

REQUEST/Agreement or any agreement arising from this agreement. Pre-emption of or to any Bankruptcy proceeding shall not discharge any obligations of this agreement. Consent and agreement with this Power of Attorney by Second Party waives any and all claims of First Party , and/or defenses and remains in effect until the satisfaction of all obligations by Second Party have been satisfied.

Sincerely,

Mark Dees
First Party

Claire Dees
First Party

Ana Cristina Oliva
Public Notary

ID# 2010-0195421-CV
Page 70

August 17th, 2010

# NOTICE OF
# OBJECTION TO FORECLOSURE SALE

See exhibit A attached for list of loan numbers.

**I object to the notice of foreclosure sale because the wrong party in interest is attempting to foreclose.** Any attempt to foreclose by the wrong party in interest will constitute fraud and deceptive buisness practices. Demand is made to prove you or your client has the original note and I demand a place nearby to view it at a convenient location according to the State Law. **This notice consitutes a cease and desist , a revocation of the power of attorney in security deed and a recission of the loan due to pretender  lender fraud.** A tender of payment in full was made upon production of the note . Your client has failed to validate their position to enforce the note and the security instrument. <u>They are not the real party in interest.</u> The security instrument was voided when the note was separated from the loan deed. Cease and desist all collection activity now.

I dispute the balance is correct and I dispute that your alleged client is the real party in interest.

_Mark Dees_

Mark Dees

_Claire Dees_

Claire Dees



ID# 2010-0195421-CV
Page 71

# NOTICE OF OBJECTION TO MODIFICATION OF LOANS

See exhibit A attached for list of loans that were modified by wrong party

August 17th , 2010

WAMU,&
J.P. MORGAN CHASE, N.A.

1. It has come to my attention through the advice of counsel that the modifications of the loans that occurred on the loans attached on exhibit "A" attached were not done or even authorized by the real party in interest and were therefore invalid and void. Also the note was separated from the loan deed at closing and at the various steps of the securities chain and were therefore void and unenforceable.

   Unless you admit or deny this within ten days that item number 1 along with proof in the form of an affidavit from the genuine Chief Financial Officer of the lender that the loans were modified with authorization from the bond certificate holders who are the real party in interest and a convenient place to view the originals, within ten days from this notice then your failure to respond on a point by point basis with an admission or denial will constitute an admission of the allegations in items number 1. above , according to Title 24 .

_Mark Dees_
Mark Dees

_Claire Dees_
Claire Dees

_Ana Cristina Oliver_
Public Notary

ID# 2010-0195421-CV
Page 72

August 17th, 2010
Legal Department
Loan Numbers: For complete list of loan numbers, see exhibit A attached hereto and incorporated
herein and made a part hereof by reference.

## NOTICE OF DEMAND FOR DEBT VALIDATION

This is notice to cease and desist all collection activity until you provide the documents
requested in the qualified written request and the good faith request for information
according to Fair Debt Collection Practices Act.
 I am hereby rescinding this loan and The power of attorney in the security deed is
hereby revoked and is being recorded and a lis pendens is being recorded and filed on
the property, and you will need to refund all payments , plus treble damages, on the loan
from the beginning plus pay treble damages and my attorney fees for TILA and RESPA
violations, usury, deceptive  business practices and fraud. I want the names , addresses
and phone numbers of each and every bond certificate holder and the security prospectus
and the pooling and servicing agreement and accounting ledgers since I believe the real
party in interest has been paid in full through tarp and or insurance.

REGARDING THE  Notice of Intent to Accelerate.
I am rebutting the items in your letter on a point by point basis as follows.
    1. J P Morgan Chase is the creditor  on  the home loan described above on behalf of  the note
    holder."
    Rebuttal.  I have previously asked you in a Qualified Written Request to provide proof that
    your company has any relationship at all with the purported lender and the bond certificate
    holders . You have failed to provide this . Please prove you have the right to collect the
    payments and payoff funds according to the Good Faith Request for Information attached.  I
    have also tendered payment in full upon production of certain documents. Where are the
    documents that I requested ?
    2.  There is no default. The loan was paid in whole or in part by tarp and or insurance proceeds
    and I want to view your ledgers and the chain of securitization unbroken back to the bond
    certificate holders who are the real parties in interest.
    3. Do you have first hand knowledge the obligation even exists. Provide the persons name
    address and phone number who has this first hand knowledge.
    4. My loan is void by the separation of the note and the security deed this was done at the
    closing table when you named mers as the grantee.
    The bond holder was the lender but they were not named on the note or security deed.
    Immediately cease and desist all collection and foreclosure activity.

_Mark Dee_        _Claire Dee_
      8/17/2010

Ana Cristina Oliver
Public Notary




Filed In Office Dec-02-2010 12:11:22
ID# 2010-0139975-CV
Page Of Court Use Only

Jay C. Stephenson
Clerk of Superior Court Cobb County

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| **MARK DEES, CLAIRE DEES** | |
| | PETITIONERS |
| **WASHINGTON MUTUAL BANK FA**<br>**CHASE HOME FINANCE LLC**<br>**JP MORGAN CHASE NA, DOES 1-1000** | VS.<br><br>RESPONDENTS |

| ATTORNEY: | TELEPHONE NUMBER: | Civil Action Number: |
|---|---|---|
| | ATTORNEY FOR: | 10-1-11419-49 |

| **AFFIDAVIT OF** | Court Date: | Court Time: |
|---|---|---|

1. At the time of service I was at least 18 years of age and not a party to this action, and I served the following documents:

   **VERIFICATION, CERTIFICATE OF SERVICE, EXHIBITS S, F**

2. Person Served: **Frank R. Olson**

   Entity Served:

   Service Address: **McCurdy & Candler LLC**

   **3525 Piedmont Road, Bldg 6, Suite 700**
   **Atlanta, Georgia 30305**

   Date Served: **11/29/2010**

   Time Served: **3:10 PM**

3. I served the person or entity in item 2 with the service documents by:

   **PLACING THE SERVICE DOCUMENTS INTO THE HANDS OF FRANK R. OLSON AN AUTHORIZED AGENT FOR MCCURDY & CANDLER, LLC.**

4. Agent Who Served Documents:

   *T. KNOTT/Agent of Dial Services*
   *3520 STONEY CREEK WAY*
   LOGANVILLE, GEORGIA 30052

   *I Declare under penalty of perjury under the laws of the State of Georgia that the statements above are true and accurate.*

   (Signature)

5. Sworn to and subscribed before me this 30th day of November, 2010.

   Notary Seal
   My Commission Expires: 03/24/2014

   Notary Public